STATE OF NORTH CAROLINA v. BENNIE LEE JACKSON

No. 54

(Filed 12 December 1973)

1. **Homicide § 14— mitigation or excuse — evidence offered against defendant**

   An accused may establish facts in mitigation or excuse of a killing from the evidence offered against him as well as the evidence he may offer himself.

2. **Homicide § 14— death from intentional shooting — presumptions**

   When the State satisfies the jury from the evidence beyond a reasonable doubt that defendant intentionally shot the deceased and thereby proximately caused his death, the law raises against him the presumptions (1) that the killing was unlawful and (2) that it was done with malice; and, nothing else appearing, the accused is guilty of second degree murder.

**3. Homicide § 14— burden of showing self-defense or absence of malice**

Where presumptions arise upon the State's evidence that a killing was unlawful and done with malice, defendant has the burden to satisfy the jury that the homicide was committed without malice, so as to mitigate it to manslaughter, or that the homicide was justified on the ground of self-defense.

**4. Homicide § 28— mitigation or excuse — instructions**

In this homicide prosecution, the jury was not limited to a consideration of mitigating circumstances arising only from the evidence offered by defendant by the court's instruction that defendant "must come forward and prove" the absence of malice or that he acted in self-defense where the court further instructed the jury that, in deciding whether mitigation or excuse existed, it should consider "all the circumstances as you find them to have existed from the evidence."

**5. Homicide § 28— instructions on self-defense — real or apparent necessity**

In this homicide prosecution, the court's use of the phrase "under the circumstances as they existed" in its instructions on self-defense did not restrict the right of self-defense to real necessity and exclude the right of self-defense under circumstances of apparent necessity.

**6. Homicide § 9— self-defense — real or apparent necessity**

The right of self-defense rests upon necessity real or apparent; and in the exercise of his lawful right of self-defense, an accused may use such force as is necessary or apparently necessary to protect himself from death or great bodily harm.

**7. Homicide § 28— instructions on self-defense — aggressor — excessive force — burden of proof**

Trial court's charge in a homicide case was erroneous in failing to require defendant to show that he was not the aggressor and did not use excessive force in order to be acquitted upon his plea of self-defense, but such error was favorable to defendant and he cannot complain thereof.

DEFENDANT appeals from judgment of *Exum, J.,* 2 April 1973 Criminal Session, GUILFORD Superior Court (Greensboro Division).

Defendant was tried upon a bill of indictment, proper in form, charging him with the first degree murder of Paul Arthur Norman on 1 December 1972.

The State's evidence tends to show that on the night of 1 December 1972 at about 9 p.m. Paul Arthur Norman was at a place called Shep's Eat-A-Bite in Greensboro. He was engaged in a little horseplay with a man named David Reece when the defendant, Bennie Lee Jackson, entered. Defendant made several

remarks about Norman's habit of grabbing people and said to Norman, "It's not going to be like it was before, you're always grabbing at people smaller than you are and picking at them." Norman told defendant to leave him alone and stated he did not want to fight defendant. The two men eventually left the bar and went outside where defendant held a gun to the nose of Norman and stated he was going to kill him. Norman said, "Go ahead and leave me alone, man, I don't want to fight you." Defendant was then seen placing the gun to Norman's forehead where he held it for several minutes. Then they both went back inside the bar. There is evidence that Norman was frightened and had tears in his eyes.

Defendant and Paul Norman then stood around inside the bar for some time. Eventually defendant "started right back on Paul Norman. He said, 'You think I'm going to shoot you in the foot, but I ain't going to shoot you in the foot . . . . I'm going to kill you.'" Norman said, "Go on and leave me alone. I don't want to fight you." Defendant then put the gun in Norman's back and told him to move, "and Paul didn't go out—wouldn't go out the door, so he stopped at the piccolo. After he stopped at the piccolo, Bennie stood there beside of him. Bennie was standing on the left side, standing on Paul Norman's left. He had his hand in his pocket right on. He just stood there beside of him and I turned around to get another beer, and when I turned back around, the gun said bam. I seen where he put the gun up to his head here. I guess he pulled the trigger. Yes, I heard the gun fire. I heard it fire. The gun was up there to his head. Yes, sir, that was the left side of Paul Norman's head."

All witnesses, both State and defense, testified that at no time during the evening did they see Paul Arthur Norman with any type of gun or knife or any other weapon. The State's witnesses testified that at no time did they see or hear the victim threaten or curse the defendant; rather, he kept telling defendant to leave him alone.

It was medically established that the cause of Paul Norman's death was a gunshot wound resulting in a massive hemorrhage in the brain. The bullet was removed from the brain by the attending pathologist.

Defendant testified he arrived at Shep's Eat-A-Bite at about 9 p.m., conversed briefly with Paul Norman inside the bar, and exchanged disparaging remarks with him. Defendant

left the bar to get change for a large bill, met one Carl Bowman and they returned to the bar together. As they entered, Bowman put a pistol in defendant's pocket and told defendant that Paul Norman had threatened to kill him, that he had better watch Norman.

Defendant further testified that Paul Norman invited the defendant outside. They went outside and Paul Norman lunged at defendant, whereupon defendant removed the gun from his pocket and told Norman, "I don't want no trouble out of you tonight. I don't want you to go hurt me and I'm not going to hurt you. The best thing for you to do is to go on and leave me alone. What is it you are mad about? I fired you from the Ford place, and you think I'm mad at you for jumping on me, but I have forgot about it. If you can let it go, I can let it go." Defendant said Norman replied, "Let's forget about the stuff," and they walked back into the bar. Shortly thereafter, a man whose nickname was Hands told defendant that Paul Norman "was trying to get me to get a gun and let him borrow it, he said he was going to kill you." Defendant said that meanwhile Paul Norman had taken a position in front of the piccolo, pointed his finger at defendant and said, ". . . It's either going to be you or me. . . . After he said that to me I started walking towards him. I was saying something like this, 'I thought you was going to forget about the mess.' I had the gun in my hand shaking it like that and the gun went off. . . . I didn't mean to shoot him. . . . The only thing I meant to do was to scare him off and keep him off of me."

Defendant said when Norman shook his finger at him and put his right hand under his sweater, he thought Norman was going for a weapon. Defendant admitted on cross-examination that at no time did Paul Norman push him, hit him, or in any-wise assault him.

Defendant offered various witnesses who testified to defendant's good reputation in the community where he lived.

Henry Chapman, Jr., testifying on behalf of defendant, said he was at Shep's Eat-A-Bite place that night, heard the argument and exchange of insults between defendant and Paul Norman, and heard Paul Norman say that defendant "wouldn't be living the next morning."

The jury returned a verdict of guilty of murder in the first degree and defendant was sentenced to life imprisonment. He

appealed to the Supreme Court assigning errors discussed in the opinion.

*Robert Morgan, Attorney General, and Roy A. Giles, Jr., Assistant Attorney General, for the State of North Carolina.*

*Vaiden P. Kendrick, Assistant Public Defender, Eighteenth Judicial District, for defendant appellant.*

HUSKINS, Justice.

The judge submitted, as permissible verdicts in this case: Murder in the first degree, murder in the second degree, voluntary manslaughter, involuntary manslaughter, or not guilty. The court correctly defined each of these crimes. After the jury had been told what the State must prove beyond a reasonable doubt in order to support a verdict of guilty of murder in the first degree, the following instruction was given:

> "Now, Members of the Jury, if the State proves beyond a reasonable doubt that the Defendant, Bennie Jackson, intentionally killed Paul Norman with a deadly weapon . . . the law raises two presumptions: First, that the killing was unlawful, and second, that it was done with malice. . . . In order for you to find the Defendant guilty of murder in the second degree, the State must proved beyond a reasonable doubt that the Defendant, Bennie Jackson, intentionally shot Paul Norman with this pistol described in the evidence, thereby proximately causing Paul Norman's death. Then nothing else appearing in the case but that, the Defendant would be guilty of murder in the second degree. (In order to reduce that offense to manslaughter, because of the presumption arising which I explained to you, the Defendant must come forward and prove not beyond a reasonable doubt but simply to your satisfaction that there was, in fact, no malice on his part, and in order to excuse the shooting altogether on the ground of self-defense, the Defendant must prove again not beyond a reasonable doubt, but simply to your satisfaction, that he acted in self-defense, and I will explain that principle to you in a minute.)"

Defendant assigns as error that portion of the foregoing charge in parentheses, contending that it required him to introduce independent evidence to mitigate or excuse the homicide whereas under the law he was entitled to rely not only on evi-

dence offered by defendant but also on the evidence offered against him. We now explore the validity of this contention.

With respect to defendant's burden to show facts in mitigation or to excuse the killing altogether on grounds of self-defense, the court further instructed the jury as follows:

> "In making this decision, you should consider all the circumstances as you find them to have existed *from the evidence,* including the size, age, and strength of the Defendant as compared to that of the victim, Paul Norman. You should consider whether any assault or threatened assault was being made upon the Defendant by Paul Norman and the fierceness of the assault, if any, upon the Defendant, whether or not Paul Norman had a weapon in his possession and any threats or communicated threats, if any, which Paul Norman had made to the Defendant in this case, or any threats, whether or not they were communicated to the Defendant in this case, made by Paul Norman." (Emphasis added.)

[1] Of course, the law in this jurisdiction permits an accused to establish facts in mitigation or excuse from the evidence offered against him as well as the evidence he may offer himself. *State v. Warren,* 242 N.C. 581, 89 S.E. 2d 109 (1955); *State v. Todd,* 224 N.C. 358, 30 S.E. 2d 157 (1944).

[2, 3] When the State satisfies the jury from the evidence beyond a reasonable doubt that defendant intentionally shot the deceased and thereby proximately caused his death, the law raises against him the presumptions (1) that the killing was unlawful and (2) that it was done with malice; and, nothing else appearing, the accused is guilty of murder in the second degree. *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305 (1968); *State v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322 (1955). "The law then casts upon the defendant the burden of showing to the satisfaction of the jury, if he can do so—not by the greater weight of the evidence nor beyond a reasonable doubt, but simply to the satisfaction of the jury—from all the evidence, facts and circumstances, the legal provocation that will rob the crime of malice and thus reduce it to manslaughter, or that will excuse it altogether upon the ground of self-defense. . . . The legal provocation that will rob the crime of malice and thus reduce it to manslaughter, and self-defense, are affirmative pleas, with the burden of satisfaction cast upon the defendant." *State v. Todd,* 264 N.C. 524, 142 S.E. 2d 154 (1965).

[4] A fair reading of the charge *as a whole* impels the conclusion that the jury was not limited to a consideration of mitigating circumstances arising only from evidence offered by defendant. The court instructed the jury that it should consider "all the circumstances as you find them to have existed from the evidence." The rule is well established that the charge of the court must be read as a whole and in the same connected way that the judge is supposed to have intended it and the jury to have considered it. *State v. Wilson,* 176 N.C. 751, 97 S.E. 496 (1918). The charge must be construed contextually, and isolated portions will not be held prejudicial when the charge as a whole is correct. *State v. Cook,* 263 N.C. 730, 140 S.E. 2d 305 (1965). If the charge presents the law fairly and clearly to the jury, the fact that some expressions, standing alone, might be considered erroneous will afford no ground for a reversal. *State v. Hall,* 267 N.C. 90, 147 S.E. 2d 548 (1966).

When the charge here is measured by these standards, no prejudicial error appears with respect to the subject matter of this assignment.

[5] Defendant assigns as error the following portion of the court's instruction relating to self-defense:

"Now, Members of the Jury, if you are satisfied that *under the circumstances as they existed* at the time of the killing the Defendant, Bennie Jackson, reasonably believed it to be necessary to shoot Paul Norman in order to save himself, Bennie Jackson, from death or great bodily harm, and that Bennie Jackson was not the aggressor, did not bring on this affray, and did not use excessive force as I have described that term to you, then it would be your duty to return a verdict of not guilty, for you would have found that he acted in self-defense." (Emphasis ours.)

Defendant contends that use of the word "existed" in the phrase above emphasized restricts the right of self-defense to *real* necessity and excludes the right of self-defense under circumstances of *apparent* necessity.

We note that elsewhere in the charge the court had already instructed the jury as follows:

"Now, in order to excuse the killing entirely on the ground of self-defense, the Defendant, Bennie Jackson, must satisfy you of four things: First, that at the time of the

shooting it appeared to him, Bennie Jackson, and he reasonably believed it to be necessary to shoot Paul Norman in order to save himself from death or great bodily harm. Second, that the circumstances as they appeared to the Defendant at the time, were sufficient to create such a belief in the mind of a person of ordinary firmness. Now, it is for you, the Jury, to determine the reasonableness of the Defendant's belief from the circumstances as they appeared to him to be at the time; in other words, you will look through the Defendant's eyes at the time of the alleged shooting and determine from what the events and circumstances appeared to him to be the reasonableness of his apprehension and belief."

After brief deliberation, the jury returned to the courtroom and requested the court "to review for us again the different verdicts we can find." The court did so, and the additional instructions included the following charge with respect to defendant's plea of self-defense:

"Now, to excuse the killing altogether on the ground of self-defense, the Defendant must satisfy you of four things: First, that it appeared to him and he reasonably believed it to be necessary to shoot Paul Norman in order to save himself from death or great bodily harm. Second, that the circumstances as they appeared to the Defendant at the time were sufficient to create such a belief in the mind of a person of ordinary firmness, and you will recall that I told you that it is for you to judge the reasonableness of his belief from all the facts and circumstances as they appeared to him at the time. Third, that he was not the aggressor, that is that he didn't participate in bringing on the argument between the two. Fourth, that he did not use excessive force, that is more force than reasonably appeared to him to be necessary at the time. Now, I instructed you that if you find that he acted properly in self-defense, that is he satisfied you that all these four conditions existed at the time of the shooting, you will find him not guilty because a person has the right to kill in defense of himself provided the conditions for it are met, if he satisfies you that they exist."

[6]  The right of self-defense, as defendant correctly contends, rests upon necessity real or apparent; and, in the exercise of his lawful right of self-defense, an accused may use such force as

is necessary or apparently necessary to protect himself from death or great bodily harm. *State v. Jennings,* 276 N.C. 157, 171 S.E. 2d 447 (1970), and cases cited. "In this connection, the full significance of the phrase 'apparently necessary' is that a person may kill even though to kill is not actually necessary to avoid death or great bodily harm, if he believes it to be necessary and has a reasonable ground for that belief. The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to him at the time of the killing. *State v. Kirby,* 273 N.C. 306, 160 S.E. 2d 24 (1968), and cases cited." *State v. Gladden,* 279 N.C. 566, 184 S.E. 2d 249 (1971).

[7] According to the record, the charge as originally given did not require defendant to show that he was not the aggressor and did not use excessive force in order to be acquitted upon his plea of self-defense. This was error favorable to the defendant of which he cannot complain. *State v. Ingland,* 278 N.C. 42, 178 S.E. 2d 577 (1971); *State v. Murry,* 277 N.C. 197, 176 S.E. 2d 738 (1970). The charge on self-defense given in the court's additional instructions is in accord with the law and afforded defendant the full benefit of the doctrine of apparent necessity. In fact, the charge as initially given was correct on that point. As expressed by Chief Justice Bobbitt in *State v. Gladden, supra,* this assignment of error "relates more to semantics than to substance." Lacking merit, it is overruled.

The State's evidence strongly portrays defendant as the aggressor in the perpetration of a senseless killing; and the record discloses no evidence, save defendant's own equivocal testimony, that he acted in self-defense. He has had a fair trial free from prejudicial error. Hence, the verdict and judgment will not be disturbed.

No error.